[No. 2121.  Decided July 11, 1896.]

LOUIS URBAN et al., Appellants, v. MARION HELMICK et al., Respondents.

LIBEL — QUESTION OF LAW — CONSTRUCTION.

In civil actions, the question whether a publication constitutes libel is one of law to be determined by the court, where the language is unambiguous.

In determining whether the language is libelous, it must be given its ordinary meaning, and the meaning cannot be extended by innuendo beyond what the words justify in connection with the extrinsic facts.

It is not libelous per se to accuse some one of being deficient in

some quality which the law does not require him as a good citizen to possess.

A publication charging a hotel proprietor with being a "hog" for the reason that he would not trade at home and build up the home trade and town as much as possible, but sent to another city' for supplies, because he wanted to make it all, is not libelous *per se*.

Appeal from Superior Court, Skagit County.—Hon. HENRY McBRIDE, Judge. Affirmed.

*Thomas B. Hardin,* and *Pierre P. Ferry,* for appellants.

*Sinclair & Smith,* and *Robinson & Rowell,* for respondents.

The opinion of the court was delivered by

GORDON, J.—The appellants (plaintiffs in the court below) were at the time of the commencement of this action engaged in the hotel business at Sedro in Skagit county. The respondents, Lovett M. Wood and wife were the owners of the weekly newspaper known as "The Trade Register," published at the city of Seattle, of which newspaper said Lovett M. Wood was editor and publisher and the respondent Ackman was associate editor. This action was instituted in the superior court for Skagit county to recover damages which appellants alleged they sustained by reason of the publication in said newspaper of the following article, written by the respondent Helmick, viz.:

"LIVE AND LET LIVE.

"SEDRO, WN., Nov. 15, 1894.
" *Editor Trade Register:*
"I am a strong believer in the old saying 'live and let live,' but in some localities there are hogs, called business men, that want it all. I believe in buying at home and building up our own trade and town as

much as possible, as the more business we do the more money there is circulated at home. We have a hotel here that does not believe in that kind of business and will not trade at home, but sends to Seattle for supplies. As this hotel gets most of its money from traveling salesmen who come to Sedro, I wish to say to them that I will not buy any goods of them or the house they represent if they stop at the Hotel Sedro from now on, or as long as they buy from Seattle or elsewhere. Neither will I buy from the Seattle house selling to them through some one else. When a business man will not trade at home he does not deserve the patronage of the traveling public.

" Respectfully yours,

" MARION HELMICK, Grocer."

After setting out the article, the complaint, by way of innuendo, alleges that —

"Defendants meant to be understood and were understood by all of the friends, acquaintances and patrons of these plaintiffs and by the readers of said newspaper and by the public generally, to charge these plaintiffs as individuals and in the management of said hotel business with being ' hogs,' thereby meaning that these plaintiffs as individuals and in the management of said hotel business were possessed of and controlled and actuated by the low, dirty, groveling, grasping, gluttonous, self-seeking and selfish instincts and characteristics of hogs or swine, and were possessed of and actuated by all of the instincts and characteristics of hogs or swine; and that said letter . . . was . . . published by said defendants with the intent thereby to provoke these plaintiffs and each of them to wrath, and to expose these plaintiffs and each of them to public hatred, contempt and ridicule, and to deprive these plaintiffs and each of them of the benefit of public confidence and social intercourse, and to injure and destroy the business of these plaintiffs; . . . and the said letter and publication thereby tended to and did expose these plaintiffs and each of them to public hatred, contempt and ridicule, and tended to and did deprive

these plaintiffs and each of them of the benefits of public confidence and social intercourse, and did greatly injure these plaintiffs and their business . . . . That these plaintiffs, by the wrongful acts of the defendants aforesaid, etc., have been damaged in the sum of $2,000."

Respondents separately demurred to the complaint upon the general ground of insufficiency. The demurrers having been sustained and appellants electing to stand upon their complaint, and refusing to amend, judgment was given dismissing the action, from which they have appealed. There are no allegations in the complaint alleging special damages, and it is the contention of the appellants that the writing is libelous *per se.* The rule is well settled in civil actions that where the language is unambiguous, the question of whether it constitutes libel becomes a question of law to be determined by the court. *Donaghue v. Gaffy,* 54 Conn. 257 (7 Atl. 552); *Moore v. Francis,* 121 N. Y. 199 (18 Am. St. Rep. 810, 23 N. E. 1127); Townshend, Slander and Libel (4th ed.), § 286. It is equally well settled that the language used must be given its ordinary meaning, and

"The plaintiff cannot, by innuendoes, extend the meaning beyond what the words justify in connection with the extrinsic facts. And when the innuendo is not justified by the antecedent facts referred to, so that without it the words are not actionable, a demurrer to the complaint will lie." 1 Boone, Code Pleading, § 163.

"The language is to be understood in the ordinary and most natural sense; and, when the writing complained of is plain and unambiguous, the question in a civil action, whether it is a libel or not, is a question of law." LACOMBE, Circuit Judge, in *Morgan v. Halberstadt,* 60 Fed. 592.

Interpreting the article in question in the light of

the rule thus laid down we think that appellants' explanation of the meaning and effect of the article must be rejected.  The article itself furnishes its own explanation of the meaning to be given to the word "hogs."   That explanation and meaning is that they do "not believe in that kind of business (that is, in buying at home and building up our own trade and town as much as possible), and will not trade at home, but send to Seattle for supplies."   This is certainly no reflection upon the character of their hotel or the kind of accommodation or refreshment which it affords.   The article does not charge or impute anything immoral or criminal, nor is it calculated to expose the appellants to public hatred, contempt or ridicule, or to deprive them of the benefits of public confidence.   Unquestionably appellants had the legal right to trade in Seattle or send there for supplies, if they deemed it to their advantage, and the publication is nothing more than "a hostile comment upon the manner in which the plaintiffs used within the pale of the law" their right to trade where and with whom they pleased.   *Donaghue v. Gaffy, supra; Homer v. Engelhardt*, 117 Mass. 540.

To accuse one of being deficient in some quality which the law does not require him as a good citizen to possess is not libelous *per se*.   The public may disapprove of appellants' conduct in thus exercising the right to trade outside of the town where they reside, but the publication does not expose them to public hatred or contempt in the sense or to the degree required by the law of libel.

It follows that the demurrers were properly sustained, and the judgment will be affirmed.

Hoyt, C. J., and Anders, Scott and Dunbar, JJ., concur.